Mitchell J. PAKULSKI, et al.,
Petitioners-Appellants,

v.

Donald T. HICKEY, Sheriff of Lucas County, Ohio, et al.,
Respondents-Appellees.

No. 83–3143.

United States Court of Appeals,
Sixth Circuit.

Argued March 8, 1984.

Decided April 13, 1984.

Henry B. Herschel, Paul Davis (argued), Christopher C. Loyd, James C. Sass, Toledo, Ohio, for petitioners-appellants.

James D. Bates, Asst. Lucas County Prosecutor (argued), Toledo, Ohio, J. Michael Carpenter, Asst. Atty. Gen. of N.C. Dept. of Justice (argued), Jack L. Cozort, Raleigh, N.C., for respondents-appellees.

Before KEITH and MERRITT, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

The question in this case is whether or not the three appellants are "fugitives" from North Carolina and subject to extradition. Extradition of appellants was ordered by Ohio Governor James A. Rhodes on May 18, 1979 upon the request of North Carolina Governor James B. Hunt. ·

The extradition has been delayed for a protracted period of time by a writ of habeas corpus improvidently granted by the Court of Common Pleas of Lucas County, Ohio, on October 2, 1979. The decision of the Common Pleas Court was reversed by the Supreme Court of Ohio in a well-reasoned opinion, *In re Rowe*, 67 Ohio St.2d 115, 423 N.E.2d 167 (1981). The appellants also filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio, Western Division.

The appellants are Mitchell Pakulski, Elliot Rowe and Donna Rowe, who appeal from the judgment of the district court dismissing their petitions for a writ of habeas corpus. We affirm. Following oral argument on March 8, 1984, this Court, from the bench on its own motion, terminated the order staying the extradition pending this appeal, entered by the district court on February 24, 1983.

**I**

The Supreme Court of Ohio summarized the facts as follows:

On September 17, 1978, the body of Willard Setzer, who had been shot, was discovered in Waynesville, Haywood County, North Carolina. On November 27, 1978, Elliot Rowe III and Mitchell John Pakulski, appellees herein, were charged in the General Court of Justice, Superior Court Division of Haywood County, with the offense of murder in the first degree, committed on or about September 17, 1978, which is a capital offense proscribed by General Statutes Section 14-17 of North Carolina. Arrest warrants were issued by the magistrate of the District Court Division of the court. On December 6, 1978, Donna Rowe, also an appellee herein, was similarly charged and an arrest warrant issued.

Appellees were thereafter arrested in Lucas County, Ohio, upon fugitive warrants issued by the Court of Common Pleas of Lucas County pursuant to R.C. 2963.11. On December 6, 1978, James B. Hunt, Jr., Governor of the state of North Carolina, formally requested of James A. Rhodes, Governor of the state of Ohio, the arrest and extradition of Elliot Rowe and Mitchell John Pakulski as fugitives from justice, followed, on December 13, 1978, with a similar request for the extradition of Donna Rowe.

On May 18, 1979, Governor Rhodes granted extradition by the issuance of an arrest warrant for appellees, which warrants were executed by the Sheriff of Lucas County. Thereafter, each appellee filed a complaint for a writ of habeas corpus, pursuant to R.C. 2963.09, to contest the legality of their arrest. The respondent, the Sheriff of Lucas County,

filed a "return" to the complaint averring, *inter alia,* that appellees were being held pursuant to a warrant of arrest issued by the Governor of the state of Ohio.

The complaints were joined for hearing and evidence presented. Essentially, by their complaint averments and evidence appellees asserted they were not fugitives from justice within the meaning of that term as used in the federal Constitution and federal and state extradition statutes, for the reason they were not in the demanding state of North Carolina on or about the date the offense charged was committed. By oral pronouncement on September 7, 1979, followed on October 2, 1979, by judgment entry, the court granted the writ of habeas corpus and discharged appellees from custody. In its judgment entry, the court *inter alia,* found beyond a reasonable doubt that appellees "were not in the state of North Carolina on the date of the alleged offense."

67 Ohio St.2d at 115–117.

In addition to the true bills of indictment for first degree murder against the three appellants previously returned by the Haywood County, North Carolina grand jury, the grand jury also returned an indictment on November 6, 1979 charging Pakulski with forgery and uttering certain checks in August 1978 prior to the Setzer murder. On November 5, 1980 Ohio's Governor Rhodes, at the request of North Carolina's Governor Hunt, granted extradition of Pakulski on these charges.

Pakulski filed a second petition for writ of habeas corpus in the United States District Court for the Northern District of Ohio, Western Division. This petition is discussed in Part VII of this opinion. The District Court granted a stay order on November 20, 1980, staying all proceedings in the Common Pleas Court of Lucas County regarding the extradition of Pakulski on the charge of forging and uttering. The State of Ohio filed a timely motion to dismiss the petition for habeas corpus and dissolve the stay order. The District Court granted the motion to dismiss the petition and dissolve the stay order in a memorandum opinion and order dated February 24, 1983.

The proceeding involving the charges against Pakulski for forging and uttering was consolidated by the District Court with the original habeas corpus proceeding involving the extradition of all three appellants on the charge of murder. The present appeal seeks reversal of the judgments of the District Court in dismissing both petitions for writs of habeas corpus.

On December 3, 1979 Pakulski was charged by a United States Grand Jury for the Western District of North Carolina with the interstate transportation of the stolen motor vehicle owned by the murder victim, Willard Setzer, and with the theft of checks stolen from the United States mail.

The United States Attorney for the Western District of North Carolina agreed, pursuant to Rule 20, Fed.R.Cr.P., to a transfer of these federal charges. Pakulski entered an *Alford* plea of guilty on March 28, 1980 before District Judge Nicholas J. Walinski, who placed him on probation for a period of three years.

## II

Interstate extradition finds its source in the Constitution of the United States, and long has enabled a State to bring alleged offenders to trial in the jurisdiction where a crime took place.

Clause 2 of Section 2, Article IV of the Constitution of the United States provides:

Section 2, Clause 2. Extradition

A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

The Supreme Court has held that the design of this Constitutional provision "was, and is, to eliminate for this purpose the boundaries of the States, so that each

may reach out and bring to speedy trial offenders against its laws from any part of the land." *Biddinger v. Commissioner of Police,* 245 U.S. 128, 133, 38 S.Ct. 41, 43, 62 L.Ed. 193 (1917).

Congress first implemented this constitutional provision in 1793. 1 Stat. 302. This principle is codified at 18 U.S.C. § 3182, which provides as follows:

### § 3182. Fugitives from State or Territory to State, District or Territory

Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.

In *Michigan v. Doran,* 439 U.S. 282, 287, 288–89, 99 S.Ct. 530, 534, 535, 58 L.Ed.2d 521, the Supreme Court stated:

The Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed. *Biddinger v. Commissioner of Police,* 245 U.S. 128, 132–133 [38 S.Ct. 41, 42–43, 62 L.Ed. 193] (1917); *Appleyard v. Massachusetts,* 203 U.S. 222, 227 [27 S.Ct. 122, 123–24, 51 L.Ed. 161] (1906).

The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus "balkanize" the administration of criminal justice among the several states. It articulated, in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art. IV. The Extradition Clause, like the Commerce Clause, served important national objectives of a newly developing country striving to foster national unity. Compare *Biddinger, supra,* with *McLeod v. Dilworth Co.,* 322 U.S. 327, 330 [64 S.Ct. 1023, 1025–26, 88 L.Ed. 1304] (1944). In the administration of justice, no less than in trade and commerce, national unity was thought to be served by de-emphasizing state lines for certain purposes, without impinging on essential state autonomy.

Interstate extradition was intended to be a summary and mandatory executive proceeding derived from the language of Art. IV, § 2, cl. 2, of the Constitution. *Biddinger, supra,* at 132; *In re Strauss,* 197 U.S. 324, 332 [25 S.Ct. 535, 537, 49 L.Ed. 774] (1905); R. Hurd, A Treatise on the Right of Personal Liberty and the Writ of Habeas Corpus 598 (1858). The Clause never contemplated that the asylum state was to conduct the kind of preliminary inquiry traditionally intervening between the initial arrest and trial.

Near the turn of the century this Court, after acknowledging the possibility that persons may give false information to the police or prosecutors and that a prosecuting attorney may act "either wantonly or ignorantly," concluded:

"While courts will always endeavor to see that no such attempted wrong is successful, on the other hand, care must be taken that the process of extradition be not so burdened as to make it practically valueless. It is but one step in securing the presence of the defendant in the court in which he may be tried, and in no manner determines the question of guilt." *In re*

*Strauss, supra,* at 332–333 [25 S.Ct. at 537].

Whatever the scope of discretion vested in the governor of an asylum state, cf. *Kentucky v. Dennison,* 24 How. 66, 107 [16 L.Ed. 717] (1861), the courts of an asylum state are bound by Art. IV, § 2, cf. *Compton v. Alabama,* 214 U.S. 1, 8 [29 S.Ct. 605, 607, 53 L.Ed. 885] (1909), by § 3182, and, where adopted, by the Uniform Criminal Extradition Act. A governor's grant of extradition is prima facie evidence that the constitutional and statutory requirements have been met. Cf. *Bassing v. Cady,* 208 U.S. 386, 392 [28 S.Ct. 392, 393–94, 52 L.Ed. 540] (1908). Once the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable.

*Michigan v. Doran* was quoted and applied by the Supreme Court of Ohio in *In re Rowe, supra,* 67 Ohio St.2d at 118–119, 423 N.E.2d 167, and by this Court in its recent opinion in *Chamberlain v. Celeste,* 729 F.2d 1071 (6th Cir. 1983).

Ohio has enacted the Uniform Criminal Extradition Act, R.C. 2963.02. The Supreme Court of Ohio began its opinion *In re Rowe, supra,* with this language:

We need not pause in this appeal for a threshold inquiry as to whether federal or state law is controlling with respect to the matter before us. It is definitively and conclusively settled that when interstate extradition is sought upon the basis that one has committed an offense in the demanding state and fled therefrom to an asylum state, federal law, both constitutional and statutory, insofar as it is applicable, is controlling. *South Carolina v. Bailey* (1933), 289 U.S. 412 [53 S.Ct. 667, 77 L.Ed. 1292]; *Innes v. Tobin* (1916), 240 U.S. 127 [36 S.Ct. 290, 60 L.Ed. 562]; *Kentucky v. Dennison,* (1860), 65 U.S. 66 [16 L.Ed. 717]; *Prigg v. Pennsylvania* (1842), 41 U.S. 539 [10 L.Ed. 1060]. Further, it is the duty of state courts to administer the federal law as construed by the United States Supreme Court. *South Carolina v. Bailey, supra.*

The controlling nature of federal law with respect to interstate extradition was recognized by this court in *Ex parte Ammons* (1878), 34 Ohio St. 518.

The Uniform Criminal Extradition Act (11 Uniform Laws Annot. 51) was adopted by the General Assembly in 1937. 117 Ohio Laws 588. In obvious recognition of the supremacy of federal law, it was provided in R.C. 2963.02 as follows:

"Subject to sections 2963.01 to 2963.27, inclusive, of the Revised Code, the constitution of the United States and all acts of congress enacted in pursuance thereof, the governor shall have arrested and delivered to the executive authority of any other state of the United States, any person charged in that state with treason, felony, or other crime, who has fled from justice and is found in this state." 67 Ohio St.2d at 117, 423 N.E.2d 167.

### III

Appellants sought to avoid extradition by undertaking to prove that they are not "fugitives"—that they were in Ohio at the time of the North Carolina murder with which they are charged.

The Supreme Court of Ohio stated *In re Rowe:*

The right to raise such issue of fugitivity in a habeas corpus proceeding in the asylum state is always open to the accused, to be determined as a question of fact, as a federal constitutional right. *Michigan v. Doran, supra; Hyatt v. People, ex rel. Corkran* (1903), 188 U.S. 691 [23 S.Ct. 456, 47 L.Ed. 657]; *Roberts v. Reilly* [116 U.S. 80, 6 S.Ct. 291, 29 L.Ed. 544], *supra.* The right to file a

writ of habeas corpus is also provided in R.C. 2963.09 (Section 10 of the Uniform Criminal Extradition Act.) This court has held that fugitivity is a proper issue for consideration both by the Governor and the habeas corpus court. *In re Harris* (1959), 170 Ohio St. 151 [163 N.E.2d 762].

It is a fundamental proposition from which there is no dissent that guilt or innocence with respect to the criminal charges is not a proper area of inquiry either by the Governor of the asylum state or the habeas corpus court. The Ohio General Assembly has by positive enactment prohibited such inquiry "except as it may be involved in identifying the person held as the person charged with the crime." R.C. 2963.18 (Section 20 of the Uniform Criminal Extradition Act). Such rule, however, does not foreclose inquiry into the fugitivity defense if raised and evidence, if probative of the fact that accused is not a fugitive even though it may also incidentally tend to prove an alibi defense, is admissible. See *State, ex rel. Davey, v. Owen* (1937), 133 Ohio St. 96 [12 N.E.2d 144].

The issuance of the Governor's warrant herein, pursuant to R.C. 2963.07, raised a presumption that appellees were in lawful custody and the burden to overcome such *prima facie* case in favor of North Carolina by sufficient proof rested upon appellees. *Michigan v. Doran, supra* (439 U.S. 282 [99 S.Ct. 530, 58 L.Ed.2d 521]); *South Carolina v. Bailey, supra* (289 U.S. 412 [53 S.Ct. 667, 77 L.Ed. 1292]).

To rebut the presumption of the lawfulness of their arrests under the Governor's warrant, appellees called 14 witnesses whose testimony, in combination, placed appellees in Toledo, Ohio, in the September 14, 1978 through September 18, 1978 time period. The witnesses were primarily, but not wholly, friends, relatives, and acquaintances of appellees. 67 Ohio St.2d at 120, 423 N.E.2d 167.

The States of Ohio and North Carolina introduced two witnesses who testified unequivocally that they saw appellants in North Carolina shortly preceding the murder of the decedent. The Supreme Court of Ohio summarized the testimony of these two witnesses in 67 Ohio St.2d at 121, footnote 2, 423 N.E.2d 167. The district court summarized their testimony as follows:

Mr. Thomas Beck, a police officer from Waynesville, North Carolina, testified that he had been on routine patrol from 6:00 p.m. to 2:00 a.m. on the evening of September 15, 1978 (Tr. 11). He was working with officer Daniel Logan (Tr. 11). Mr. Beck was making routine rounds of the bars in Waynesville that evening to check for underage drinkers (Tr. 12–13). He testified that he saw Donna Rowe at approximately 8:00 or 8:15 in a bar known as the Casa Grande Club in the town of Waynesville and that she was accompanied by a woman he identified as Marion Rupe (Tr. 14). He had a conversation with Marion Rupe regarding her age and the consumption of alcohol (Tr. 16).

He later returned to the Casa Grande Club between 11:30 p.m. and 11:45 p.m. where he again observed Donna Rowe enter the bar with a man he identified as Mitch Pakulski (Tr. 18–19). He testified that he could not describe Donna Rowe's attire at 8:00 p.m. but that later in the evening he remembered that she wore blue jeans, a light-colored blouse and knee-high boots. He further indicated that each of the petitioners was wearing a black riding hat with a red feather in it. (Tr. 18–19).

The State next called Marion Rupe, age 17, a resident of Waynesville, North Carolina, to the stand. She stated that Donna Rowe and Elliot Rowe are her first cousins (Tr. 3–4). She saw them on September 15, 1978 at the trailer home of her sister, Frankie Rupe, in Waynesville at approximately 4:30 p.m. They discussed arrangements to go to the Casa Grande Club that evening to celebrate the witness's seventeenth (17th) birthday. Both Donna and Frankie agreed to

go only after Marion provided them with pants to wear (Tr. 7–8).

That evening Marion's brother Clyde and Elliot Rowe drove her to the Casa Grande Club where she arrived at about 7:10 p.m. Elliott Rowe never entered the bar and Marion never saw him again the rest of the evening (Tr. 9).

Donna Rowe and Frankie Rupe arrived at the Casa Grande at about 7:30 p.m. (Tr. 10). Marion described Donna's attire as consisting of Wrangler jeans, a red top with no sleeves, and a black hat with a red feather in it. The cuffs of Donna's jeans were tucked inside her knee-high boots (Tr. 10). Marion testified that she remembered speaking to a police officer that evening regarding underage alcohol consumption but she did not know the officer's name (Tr. 11–13).

Marion stated that Mitch Pakulski entered the club at about 8:15 p.m. (Tr. 14). He was wearing blue jeans, a Wrangler jacket and a black hat with a red feather in it. The cuffs of his pants were tucked in the top of his boots (Tr. 15). Marion saw Donna Rowe and Mitchell Pakulski go outside together (Tr. 15). Donna came back in after about 15 minutes but Marion didn't see Pakulski the rest of the evening (Tr. 17). Marion left the bar at about 11:15 to go home (Tr. 17). Donna Rowe returned to the trailer at about 2:00 a.m. (Tr. 19).

The next day, September 16, 1978, Marion saw Donna Rowe, Mitch Pakulski and Elliott Rowe when they drove up to her house in the company of a male stranger who she didn't know at about 1:15 p.m. (Tr. 20). After a short conversation they left her home and she did not see them the rest of the day (Tr. 20–22).

## IV

The general purpose of extradition law was defined by the Supreme Court in *Appleyard v. Massachusetts*, 203 U.S. 222, 227–228, 27 S.Ct. 122, 124, 51 L.Ed. 161 (1906), as follows:

The constitutional provision that a person charged with crime against the laws of a State and who flees from its justice must be delivered up on proper demand, is sufficiently comprehensive to embrace any offense, whatever its nature, which the State, consistently with the Constitution and laws of the United States, may have made a crime against its laws. *Kentucky v. Dennison*, 24 How. 66, 69 [16 L.Ed. 717]; *Ex parte Reggel*, 114 U.S. 642, 650 [5 S.Ct. 1148, 1152–53, 29 L.Ed. 650]. So that the simple inquiry must be whether the person whose surrender is demanded is in fact a fugitive from justice, not whether he *consciously* fled from justice in order to avoid prosecution for the crime with which he is charged by the demanding State. A person charged by indictment or by affidavit before a magistrate with the commission within a State of a crime covered by its laws, and who, after the date of the commission of such crime leaves the State—no matter for what purpose or with what motive, nor under what belief—becomes, from the time of such leaving, and within the meaning of the Constitution and the laws of the United States, a fugitive from justice, and if found in another State must be delivered up by the Governor of such State to the State whose laws are alleged to have been violated, on the production of such indictment or affidavit, certified as authentic by the Governor of the State from which the accused departed. Such is the command of the supreme law of the land, which may not be disregarded by any State. The constitutional provision relating to fugitives from justice, as the history of its adoption will show, is in the nature of a treaty stipulation entered into for the purpose of securing a prompt and efficient administration of the criminal laws of the several States—an object of the first concern to the people of the entire country, and which each State is bound, in fidelity to the Constitution, to recognize. A faithful, vigorous enforcement of that stipulation is vital to the harmony and welfare of the States. And while a State should take care, within the limits of the law, that the rights of its

people are protected against illegal action, the judicial authorities of the Union should equally take care that the provisions of the Constitution be not so narrowly interpreted as to enable offenders against the laws of a State to find a permanent asylum in the territory of another State.

*South Carolina v. Bailey*, 289 U.S. 412, 53 S.Ct. 667, 77 L.Ed. 1292 (1933) involved an extradition proceeding in which the alleged fugitive claimed to have been absent from the demanding state when the murder was committed and consequently that he was not a fugitive from justice. A state court of the asylum state, after hearing the testimony of thirty or more witnesses and considering a number of affidavits, concluded that the petitioner was not a fugitive and ordered his release from custody. The Supreme Court of the asylum state affirmed. The United States Supreme Court reversed on the ground that there was a conflict of evidence on the issue of fugitivity. This decision held that a person who has been arrested in one state as a fugitive from justice, and who seeks discharge by habeas corpus upon the ground that he was not in the demanding state at the time of the alleged crime, has the burden of proving the alibi beyond a reasonable doubt; and, if the evidence is conflicting, he should not be released. 289 U.S. at 422, 53 S.Ct. at 671.

In *Munsey v. Clough*, 196 U.S. 364, 375, 25 S.Ct. 282, 285, 49 L.Ed. 515 (1905), the Supreme Court wrote: "[T]he Court will not discharge a defendant arrested under the governor's warrant where there is merely contradictory evidence on the subject of presence in or absence from the State, as habeas corpus is not the proper proceeding to try the question of alibi, or any question as to the guilt or innocence of the accused."

In *Pettibone v. Nichols*, 203 U.S. 192, 206, 27 S.Ct. 111, 115, 51 L.Ed. 148 (1906), the Court, speaking through Justice John Marshall Harlan, stated: "The constitutional and statutory provisions referred to were based upon the theory that, as between the States, the proper place for the inquiry into the question of the guilt or innocence of an alleged fugitive from justice is in the courts of the State where the offense is charged to have been committed."

Numerous decisions from the United States Courts of Appeals are to the same effect. For example, in *United States v. Flood*, 374 F.2d 554 (2nd Cir.1967), the Second Circuit was presented with a petition for writ of habeas corpus by a person the State of Florida sought to extradite from New York on a Florida murder charge. Petitioner and a number of his friends and relatives testified at a habeas corpus hearing in a New York court that he was in New York on the date of the murder. Florida presented the testimony of a police officer and one other witness that the petitioner was seen in Dade County, Florida, on the date of the crime. The New York trial court dismissed the petition and the Appellate Division of the New York Supreme Court affirmed. A federal writ of habeas corpus was denied by the United States District Court. In affirming the denial of the writ, the Second Circuit stated:

> There is no merit to the petitioner's contention that the burden of proof placed upon him was too heavy. It was settled long ago that the burden of proving that the accused was not present in the demanding state at the time the crime was committed rests upon him and that, to meet it, he must conclusively establish his absence by clear and convincing proof. *State of South Carolina v. Bailey*, supra, 289 U.S. at 421, 53 S.Ct. 667 [671]; *People of State of Illinois ex rel. McNichols v. Pease*, 207 U.S. 100, 112, 28 S.Ct. 58 [62], 52 L.Ed. 121 (1907); *Munsey v. Clough*, supra. In the present case there was conflicting evidence, and so long as there was sufficient state's evidence to support the court's finding of probable cause its conclusions must stand and New York is obligated to surrender the petitioner to Florida for trial. *Hyatt v. People of*

*State of New York ex rel. Corkran,* supra, 188 U.S. at 710–711, 23 S.Ct. 456 [458–59], 47 L.Ed. 657; *Moncrief v. Anderson,* supra, 342 F.2d at 904.

374 F.2d at 558.

In *Smith v. Idaho,* 373 F.2d 149 (9th Cir.) *cert. denied* 388 U.S. 919, 87 S.Ct. 2139, 18 L.Ed.2d 1364 (1967), the Court of Appeals for the Ninth Circuit ruled that mere conflicts in the evidence relating to fugitivity do not provide a basis for denying extradition.

Courts of a number of states have enunciated principles similar to the federal cases just recited. *See, e.g., People ex rel Dragon v. Trombley,* 79 A.D.2d 768, 435 N.Y. S.2d 60 (1980); *Bazaldua v. Hanrahan,* 92 N.M. 596, 592 P.2d 512 (1979); *People v. Swisher,* 60 Ill.App.3d 452, 17 Ill.Dec. 651, 376 N.E.2d 797 (1978); *Clark v. Warden,* 39 Md.App. 305, 385 A.2d 816 (1978); *Walton v. Idaho,* 98 Idaho 442, 566 P.2d 765 (1977); *Reeves v. State ex rel Thompson,* 199 Tenn. 598, 288 S.W.2d 451 (1956); and *Ex Parte Rabinwitz,* 61 Okl.Cr. 83, 65 P.2d 1236 (1937).

**V**

■ With respect to the appellants in the present appeal, the Supreme Court of Ohio reversed the judgment of the Court of Common Pleas and remanded custody of appellants to the Sheriff of Lucas County for surrender to the proper agents of the State of North Carolina, stating:

> We agree and conclude under the *ratio decidendi* of *Munsey v. Clough* and *South Carolina v. Bailey,* first, the burden is upon the petitioner to rebut the presumption created by the issuance of the Governor's warrant that the petitioner is a fugitive from justice by proof beyond a reasonable doubt. Secondly, that where there is contradictory evidence upon the issue of fugitivity and there is substantial and credible evidence placing the petitioner in the demanding state on or about the date of the offense, the petitioner has not met the burden placed upon him and the habeas corpus court may not, under the guise of pass-

ing upon the credibility of witnesses, resolve the fact of the petitioner's presence in the demanding state in favor of the petitioner and discharge him from custody. To conclude otherwise and hold the court possesses its ordinary unlimited authority to pass upon the credibility of witnesses and resolve disputed questions of material fact would not be consonant with the summary and unique character of extradition proceedings wherein issues of guilt and innocence, including alibi, are for resolution in the courts of the demanding state.

67 Ohio St.2d at 123–124, 423 N.E.2d 167.

In dismissing the petition for writ of habeas corpus filed by the three appellants, District Judge Nicholas J. Walinski stated:

> This Court finds that the Ohio Supreme Court's determination is "fairly supported by the record." *Sumner v. Mata,* 449 U.S. 539 [101 S.Ct. 764, 66 L.Ed.2d 722] (1981). The state of North Carolina presented credible evidence which is in conflict with the evidence presented by the petitioners as to their presence in North Carolina at the time of the alleged homicide. Such being the case, the credible evidence being in conflict, the petitioners have failed to sustain their burden on the issue of proving beyond a reasonable doubt their absence from the state of North Carolina at the time of the alleged homicide.

This Court concludes that the foregoing decision of the district court is correct. Appellants will have an opportunity at their trial in North Carolina to introduce any available evidence to support their alibi that they were in Ohio at the time the alleged murder was committed.

**VI**

■ As pointed out in Part I of this opinion, appellant Pakulski individually filed a second petition for writ of habeas corpus resisting the extradition order by Ohio's Governor Rhodes with respect to his indictment for forging and uttering stolen checks. Pakulski charged that the second

extradition request by North Carolina subjected him to double jeopardy and that North Carolina's repeated attempts to extradite him violated due process.

The district court dismissed this petition for habeas corpus and dissolved its stay order previously issued which restrained proceedings in the Court of Common Pleas of Lucas County on authority of *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), *Michigan v. Doran, supra,* 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978) and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

District Judge Walinski correctly stated:

The Court finds that federal intervention at this time to resolve the petitioner's claims would be premature. The petitioner may assert any claims of prosecutorial improper conduct and double jeopardy in the state courts of North Carolina and, if appropriate and necessary, he may seek habeas corpus remedies in the federal courts.

We agree with the conclusion of the district court.

The judgments of the district court dismissing the petitions for writs of habeas corpus are affirmed.